# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

APRIL LOCCARA BROWN CARTER, )
                                    )
       Plaintiff,            )
                                      )
v.                                  )
                                    )      Case No. CV415-161
CAROLYN COLVIN,         )
Acting Commissioner of    )
Social Security,         )
                                      )
       Defendant.      )

# <u>REPORT AND RECOMMENDATION</u>

Alleging that she suffers from seizures and from an intellectual disability, April Loccara Brown Carter seeks judicial review of the Social Security Administration (SSA) Commissioner's denial of her application for Disability Insurance benefits (DIB), and Supplemental Security Income (SSI). She testified at an administrative-review hearing before an Administrative Law Judge (ALJ) and unsuccessfully appealed an adverse ruling to the SSA's Appeals Council. Doc. 6-2 at 2.[1]

---

[1] "Doc." citations use the docket and page numbers imprinted by the Court's docketing software. Those do not always line up with each paper document's printed pagination.

# I. GOVERNING STANDARDS

In social security cases, courts

> review the Commissioner's decision for substantial evidence. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (quotation omitted). . . . "We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner." *Winschel*, 631 F.3d at 1178 (quotation and brackets omitted). "If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation omitted).

*Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).

The burden of proving disability lies with the claimant. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). In response to the showing the claimant makes, the ALJ applies

> a five-step, "sequential" process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(1). If an ALJ finds a claimant disabled or not disabled at any given step, the ALJ does not go on to the next step. *Id.* § 404.1520(a)(4). At the first step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. *Id.* § 404.1520(a)(4)(i). At the second step, the ALJ must determine whether the impairment or combination of impairments for which the claimant allegedly suffers is "severe." *Id.* § 404.1520(a)(4)(ii). At the third step, the ALJ must decide whether the claimant's severe impairments meet or medically equal a listed impairment. *Id.* § 404.1520(a)(4)(iii). If not, the ALJ must then determine at step four whether the claimant has the RFC to perform

her past relevant work. *Id.* § 404.1520(a)(4)(iv). If the claimant cannot perform her past relevant work, the ALJ must determine at step five whether the claimant can make an adjustment to other work, considering the claimant's RFC, age, education, and work experience.[1] An ALJ may make this determination either by applying the Medical Vocational Guidelines or by obtaining the testimony of a VE. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011).

*Stone v. Comm'r. of Soc. Sec. Admin.*, 596 F. App'x, 878, 879 (11th Cir. 2015) (footnotes added).

## II. BACKGROUND

Carter was 25 years old as of her alleged disability date, September 1, 2010. Doc. 6-2 at 17. She repeated kindergarten and was first evaluated in the first grade (1993) yielding "a Verbal Scale IQ of 72, a Performance Scale IQ of 70, and a Full Scale IQ of 69." *Id.* at 2. She was ineligible for special education until the third grade. *Id.* By age 15 (in 2001), Carter fell below average in reading, math, and

---

[1]  At steps four and five, the ALJ assesses the claimant's residual functional capacity (RFC) and ability to return to her past relevant work. *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). RFC is what "an individual is still able to do despite the limitations caused by his or her impairments." *Id.* (citing 20 C.F.R. § 404.1545(a); *Moore v. Comm'r of Soc. Sec.*, 478 F. App'x 623, 624 (11th Cir. 2012). "The ALJ makes the RFC determination based on all relevant medical and other evidence presented. In relevant part, the RFC determination is used to decide whether the claimant can adjust to other work under the fifth step." *Jones v. Comm'r of Soc. Sec.*, 603 F. App'x 813, 818 (11th Cir. 2015) (quotes and cite omitted).

language, with a Verbal IQ of 62, a Performance IQ of 59, and a Full Scale IQ of 56. *Id.* at 3 (Feb. 9, 2001 school psychological report). Plaintiff ultimately received a special education diploma and did not attend any trade or other schools afterwards. *Id.* at 35-36.

The ALJ's ruling did not expressly note the IQ scores in the record but did note the 2001 school records reflecting some of them. Doc. 6-2 at 19 (citing "Exhibit 1F"). Too, he considered a 2007 psychological consultation by Arthur W. Hartzell, Ph.D. *Id.* at 20 (citing doc. 6-8 at 21). Hartzell measured Carter's IQ (she then was 22), and noted a Verbal IQ of 68, performance IQ of 76, and a full scale IQ of 69. Doc. 6-8 at 24; *see also id.* ("Her Full Scale IQ of 69 indicates that she functions in the *extremely* low classification of intelligence overall and at about the *second* percentile of intelligence as compared to other women her age.") (emphasis original).[2]

---

[2]   Carter cites IQ scores from before and after age 16.   Doc. 8 at 2.   While useful for providing a long-term perspective, pre-16 scores are otherwise not considered for adult claimants.   *Southard v. Colvin*, 2015 WL 1186153 at * 6 n. 3 (N.D. Ala. Mar. 16, 2015) ("Under the Regulations, IQ scores prior to age 16 and more than 2 years old are not valid for determining [the claimant's] current functioning. *See* 20 C.F.R. Part 404, Subpart P, App. 1, Listing 112.00(D)(10) (stating IQ scores obtained before age 16 are valid only for two years."). Conversely, "a claimant need not present evidence that she manifested deficits in adaptive functioning prior to the age twenty-two, when she

Carter testified that she worked "off and on" over the years: five years at Goodwill, and she also "cut fiberglass and [aircraft] skin tape for Gulfstream." *Id.* at 37. Other jobs included fast-food cashier and food preparer, but she was let go because "I used to have seizures, and they said they couldn't no longer risk me trying to stew[3] them because I'm -- my having seizure on the job and stuff like that." *Id.* at 40 (footnote added). Seizure medication "helps sometimes, but half of the time, it really doesn't help. But if I take my medication like I supposed to [sic], it'll help me, like, during the day." *Id.* at 41.

Carter claims that she suffers daily from seizure-caused headaches but that she has not been able to travel to get evaluated. *Id.* at 41-42; *see also id.* at 57 (on follow-up questioning by her attorney, she testified that "I have them probably, like, six times out of the month."); *id.* ("I left [employment at a fast-food vendor] KFC because

---

presented evidence of low IQ test results after the age of twenty-two." *Hodges v. Barnhart*, 276 F.3d 1265, 1266 (11th Cir. 2001), quoted in *Monroe v. Comm'r of Soc. Sec.*, 504 F. App'x 808, 810 (11th Cir. 2013).

[3] The Court is unable to divine what this means.

of that.").[4]    For a short period, plaintiff performed janitorial services at a mall, but was terminated due to "a big misunderstanding. They were saying something, that I was shoplifting and stuff like that."   *Id.* at 50.

Plaintiff got married in 2012.   Doc. 6-2 at 35-36.   She and her husband live with her parents in their home.   *Id.* at 37.   She has no driver's license -- she has repeatedly failed the written exam -- and traveled by bus to the hearing.   *Id.* at 36.   Plaintiff helps her mother with housework and laundry, and sometimes cooking.   *Id.* at 42.   She does not know how to do yard work or gardening, so she does not help out there.   *Id.*   She does not attend church because she is a Jehovah's Witness, and she owns no computer.   *Id.* at 42-43.   She did have a smart phone and a Facebook page, but both are now things of the past. *Id.* at 43.   However, she does visit the library to use its computer.   *Id.*

Carter helps her daughter with her homework "the best way I know how," and sometimes does crossword puzzles with her.   Doc. 6-2

---

[4]    Carter explained that during seizures she bites her tongue and "I lose conscious [sic], and when I do get from out of my seizures, I have to ask somebody that's been around me or what happened and stuff like that, but I know when I'm about to have a seizure because my head hurts.   My head's be killing [sic] me so bad, so I just cries [sic]."   Doc. 6-2 at 58.

at 43. And, she likes to fish. *Id.* She grocery shops and can cook simple meals. *Id.* at 43-44; *see also id.* at 57 ("I can cook from scratch."). She used to have a checking account, endures no problems bathing or dressing, can use the telephone and mail letters. However, she claims that she cannot perform a cashier's job "because I'm not good at money like that. . . ." *Id.* at 44. She is able, nevertheless, to make change from a dollar, and she shops with her husband for her daughter's clothes. *Id.* at 45.

While questioned by her attorney, she stated that she had difficulty grasping and remembering basic job requirements, and that job supervisors were not pleased with her comprehension/retention capabilities. Doc. 6-2 at 55. Also, she does not feel competent enough to live on her own. *Id.* at 56. She cited reading and comprehension deficits. *Id.* at 56-57.

The ALJ posed a hypothetical question to a Vocational Expert (VE). Doc. 6-2 at 60. It was premised on one "[w]ho could do light exertional work, no higher than [a specific vocational preparation level 2]; simple, routine; should have no more than occasional changes in

kind of work is done; no detailed instructions; should not work at heights; should not work around war hazards; should not work around hazardous machinery. Would there be positions?" Doc. 6-2 at 60. The VE opined that work like that of "small products assembler," "hand packer," and "fast food cashier position" would fit that capability profile. *Id.* at 60-61.

Applying the five-step sequential evaluation process, doc. 6-2 at 19-25, the ALJ found that Carter had not engaged in substantial gainful activity since September 1, 2010, and suffers from severe impairments of intellectual disability, learning disability, and non-epileptic seizures. *Id.* at 19. However, she does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. pt. 404, Subpt. P, App. 1. *Id.* at 20-21.

He next found that plaintiff has the RFC for light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except she is limited to simple, routine work, with occasional changes and she must avoid hazards "such as heights and moving machinery." *Id.* at 22. While her RFC would not allow her to perform her past relevant work, *id.* at 23, her RFC, age,

education, and work experience would allow her to perform other work that existed in significant numbers -- the VE's cited jobs. *Id.* at 23-24. Accordingly, he found that she is not disabled.   *Id.* at 24-25.

## III.  ANALYSIS

Carter argues that the Court should reverse the Commissioner's decision because the ALJ failed to find that she meets Listing 12.05, Intellectual disability -- something that, if found, would compel a disability conclusion.   Doc. 8 at 4-9.   Hence, she challenges step three of the sequential evaluation process.   To meet Listing 12.05,

> a "claimant must at least (1) have significantly subaverage general intellectual functioning; (2) have deficits in adaptive behavior; *and* (3) have manifested deficits in adaptive behavior before age 22." [*Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)]. These requirements are referred to as the listing's "diagnostic criteria." *See* 20 C.F.R. pt. 404, subpt. P., app. 1, § 12.00 ("Listing 12.05 contains an introductory paragraph with the diagnostic description for [intellectual disability]."). *In addition* to satisfying the diagnostic criteria, a claimant must meet one of the four severity requirements in paragraphs A through D of the listing. *See id.* § 12.05. Under paragraph C, the only paragraph at issue here, a claimant must show that [he] has both "[a] valid, verbal, performance, or full scale IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

*Frame v. Comm'r, Soc. Sec. Admin.*, 596 F. App'x. 908, 910-911 (11th

Cir. 2015) (emphasis added); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified" requirements—"[a]n impairment that manifests only some . . . no matter how severely, does not qualify."); *Engle v. Colvin*, 2014 WL 3721826 at * 11 (N.D. Ind. July 25, 2014) ("Engle's low IQ score and additional physical and mental impairments, however, are not enough by themselves to meet Listing 12.05C. He must also demonstrate significantly subaverage general intellectual functioning *with* deficits in adaptive functioning initially manifested during the developmental period; that is, an onset of the impairment before age twenty-two.") (emphasis added); *Hill v. Colvin*, 2016 WL 1230005 at * 7-8 (M.D. Ala. Mar. 29, 2016).[5]

A sub-70 IQ score triggers a rebuttable presumption:

A valid IQ score of 60 to 70 satisfies the first prong of paragraph C and creates a rebuttable presumption that the claimant satisfies the diagnostic criteria for intellectual disability. *See Hodges v.*

---

[5] "A specific diagnosis of mental retardation . . . is not necessary to meet the Listing." *White v. Colvin*, 2015 WL 4462209 at * 2 n. 5 (M.D. Ala. July 21, 2015). Also, "'a claimant need not present evidence that she manifested deficits in adaptive functioning prior to the age twenty-two, when she presented evidence of low IQ test results after the age of twenty-two.'" *Hartman v. Colvin*, 2014WL3058550 at * 2 (S.D. Ala. July 7, 2014)) (quoting *Hodges v. Barnhart*, 276 F.3d 1265, 1266 (11th Cir. 2001)).

*Barnhart*, 276 F.3d 1265, 1268–69 (11th Cir. 2001). At the same time, it is well established that such a presumption does not arise where a qualifying IQ score is inconsistent with other record evidence concerning her daily activities and behavior. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (citing *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986)).

*Frame*, 596 F. App'x. at 911; *Cody v. Colvin*, 2015 WL 5162280 at * 3

(S.D. Ga. Sept. 2, 2015).   In that regard,

> [t]here has been much litigation over the second requirement of § 12.05C of the Listings, *i.e.*, that the claimant must have "a physical or other mental impairment imposing additional and significant work related limitations of function." On numerous occasions, the courts have considered the issue of how severe the impairment other than mental retardation must be in order for the claimant to meet the Listing.

Soc. Sec. Dis. L & Proc. in Fed. Ct. § 5:47 (Jan. 2016).   "[T]he

impairment causing significant limitations need not, by itself, cause

inability to engage in gainful activity." *Id.*

The bottom line here, then, is that Carter could meet "the criteria

for presumptive disability under section 12.05(C) [by presenting] a

valid IQ score of 60 to 70 inclusive, *and* evidence of an additional

mental or physical impairment that has more than 'minimal effect' on

the claimant's ability to perform basic work activities." *Hill*, 2016 WL

1230005 at * 8 (quotes and cites omitted; emphasis added) (citing

*Monroe*, 504 F. App'x at 810)).

An ALJ can make findings to negate the presumption, if not rebut it. *See Grant v. Astrue*, 255 F. App'x 374, 375 (11th Cir. 2007); *Lowery*, 979 F.2d at 837; *Popp,* 779 F.2d at 1499 (rejecting a mental retardation, § 12.05(C) claim where the claimant's 69 I.Q. score was inconsistent with evidence that he had a two-year college associate's degree, was enrolled in a third year of college as a history major, and had worked in various technical jobs such as an administrative clerk, statistical clerk, and an algebra teacher).[6]  In that respect, merely showing a special education history will not suffice.  *Adkins v. Astrue*, 226 F. App'x 600, 602, 605 (7th Cir. 2007) (although claimant "completed the eighth grade in special education classes," that was insufficient to prove significantly subaverage general intellectual functioning or deficits in adaptive functioning before

---

[6]    *See also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (claimant was not disabled by mental impairment where he successfully held employment for many years with the cognitive abilities he currently possessed, demonstrated he was capable of receiving and applying job skill training, cared for his family by performing household chores and paying all the bills, played games such as dominoes and cards with his friends, and was capable of following the instructions necessary for making a cake); *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3rd Cir. 1992) (IQ score of 66, but the fact that claimant worked for twenty-two years at a steel drum factory refuted claim of deficient intellectual functioning before age 22), cited in *Yates v. Astrue*, 2009 WL 5207483 at * 8 (S.D. Ala. Dec. 30, 2009) (collecting cases).

age 22); *Yates,* 2009 WL 5207483 at * 6-8 (special education classes do not in themselves prove subaverage intellectual functioning with deficits in adaptive functioning before age 22), cited in *Thackery v. Astrue*, 2013 WL 1319595 at * 6 (S.D. Ind. Mar. 29, 2013).

Here, the ALJ tacitly conceded that Carter met Listing 12.05's IQ leg (*i.e.*, that she consistently scored in the 60-70 range) and instead focused on Listing 12.05's adaptive-function leg. Doc. 6-2 at 21. He noted her education history, work history, ability to read, communicate, care for herself, perform household duties, and her ability to perform other daily activities when he determined that she did not have the requisite deficits in adaptive functioning. *See e.g., Harris v. Comm'r of Soc. Sec.*, 330 F. App'x 813, 815 (11th Cir. 2009).[7]

---

[7]   This dovetails with what the SSA has formalized:

The Social Security Administration's Program Operations Manual System (POMS)[, which] states that the phrase "adaptive functioning" refers to "the individual's progress in acquiring mental, academic, social and personal skills as compared to other unimpaired individuals of his/her same age." POMS DI 24515.056(D)(2). Similarly, the American Psychiatric Association states that the phrase refers to how effectively an individual copes with the common demands of life and how well the individual meets the standards for personal independence expected of someone in [his] particular age group, sociocultural background, and community setting. Diagnostic and Statistical Manual of Mental Disorders IV–TR, at 42 (4th ed. 2000); *see also Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (explaining that the phrase "adaptive functioning"

More specifically, he cited Carter's high school (albeit special-education tinged) degree *and* a ten-year work history, including one job with a five-year span, and two jobs terminated (the ALJ was authorized to find) *not* because of incapability, but a "misunderstanding" with her boss on one, and that she simply quit after another job's hours were cut. Doc. 6-2 at 19-23. He also noted Dr. Hartzell's 2007 examination, where he found her mood, speech and affect appropriate, with no memory problems. She tested at "borderline range of intelligence optimally," *id.* at 20, though she does labor under a reading disorder. *Id.*

For that matter, Carter denied any history of psychiatric problems or treatment for same, and she was not then taking any psychotropic medication. Doc. 6-2 at 20. Hartzell also found that "[s]he was able to interact with co-workers, supervisors, and/or the public as she was working full-time. She was able to adhere to a work schedule and to meet production normal on simple tasks in a job situation, as she was working."

---

in Listing 12.05 refers to an individual's ability to cope with the challenges of ordinary life).

*Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x. 980, 983 n. 4 (11th Cir. 2013), quoted in *White v. Colvin*, 2015 WL 4462209 at * 4 (M.D. Ala. July 21, 2015).

*Id.* He diagnosed her with a reading disorder, "Borderline Intellectual Functioning," and a "Global Assessment Functioning "(GAF) of 58.[8]  *Id.*

The ALJ also considered the medical evidence about Carter's seizures, including the progress notes from her treating physician, Jessica Carter, M.D.  Doc. 6-2 at 20.  He took into account the "headache and seizure disorder" diagnosis, *id.,* but also noted that a 2012 EEG report revealed "no epileptic form discharges or focal slowing."  Put another way, claimant's "EEG was normal," and "Dr. Carter opined that there

---

[8]   As another court explains, the GAF

> is a subjective determination that represents the clinician's judgment of the individual's overall level of  functioning.  *Wesley v. Comm'r of Soc. Sec.,* No. 99–1226, 2000 WL 191664, at *3 (6th Cir. 2000). Failure to reference a GAF score is not, standing alone, sufficient ground to reverse a disability determination.  *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir.2002).  An assessment of a GAF score of *50 or below* can indicate serious mental impairments in functioning. *McCloud v. Barnhart,* 166 Fed.Appx. 410, 418 (11th Cir.2006) (citing the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994)). For any GAF score in the medical record revealing possible serious mental impairments, the ALJ should determine what weight, if any, to give that particular score. *Id.* However, the GAF scale "'does not have a direct correlation to the severity requirements in [the] mental disorders listings.'"  *Nye v. Commissioner of Social Sec.,* 524 Fed.Appx. 538 (11th Cir. 2013). Therefore, the ALJ is not required to rely on a GAF score in making his ultimate disability determination. *Luterman v. Commissioner,* 518 Fed.Appx. 683, 690 (11th Cir. 2013).

*Sanders v. Astrue,* 974 F. Supp. 2d 1316, 1319-20 (N.D. Ala. 2013) (emphasis added). Here the ALJ did expressly considered Carter's GAF score of *58.*  Doc. 6-2 at 20; *see also* doc. 6-8 at 25.

was a good chance that the claimant was having non-epileptic seizures or psychogenic seizures, depression and anxiety, and chronic headaches [cit]." *Id.*; *see also* doc. 6-9 at 45 (Dr. Carter's "May 15, 2013" report on claimant's May 9, 2013 visit, noting that her "spells that are thought to represent seizures are brought in by stress. Headache is sometimes a warning."); *see also* doc. 6-9 at 50 (2012-conducted, 48-hour ambulatory EEG report, "done to evaluate seizure activity," with this assessment: "There were no epileptiform discharges or focal slowing seen."); doc. 6-9 at 52 (2011 Dr. Carter report: "Her EEG in the office was normal"; "There is a good chance that she is having non-epileptic seizures of psychogenic seizures'"; "CHRONIC HEADACHES. These could be stress-induced as well."). Plaintiff's headaches, in turn, "are controlled with medication and they cause no functional limitations." Doc. 6-2 at 20. Nor, the ALJ was authorized to conclude, would they be shown to preclude the above-noted, light work.

Carter has other claimed ailments and encumbrances, and the ALJ considered them, too. While she claims to suffer from diabetes, for example, no medical evidence supports anything beyond a nonsevere

classification. Doc. 6-2 at 20. The ALJ also cited plaintiff's home activities, including the fact that she helps with housework, goes to the movies, fishes, cooks meals, does crossword puzzles with her daughter, and goes to the library to use its computer. *Id.* at 22. "Obviously," he found, "claimant's adaptive functioning is pretty high." *Id.* at 23.

This evidence, the Commissioner argues, constitutes substantial evidence, doc. 9 at 14, and the Court agrees. Substantial evidence supports a finding that Carter does not suffer substantial deficits in adaptive functioning *and* that she lacks significantly subaverage general intellectual functioning. Indeed, and as the Commissioner emphasizes here, doc. 9 at 10, a diagnosis of borderline intellectual functioning is "mutually exclusive" of intellectual disability. *Jordan v. Comm'r of Soc. Sec. Admin.*, 470 F. App'x 766, 768-69 (11th Cir. 2012); *see also Hickel v. Comm'r of Soc. Sec.*, 539 F. App'x 980, 984-85 (11th Cir. 2013) (physicians' assessment that claimant had borderline intellectual functioning rather than mild mental retardation supported finding that claimant did not meet Listing 12.05)). And it is significant that Carter's brief conspicuously hammers away at partly dated IQ scores while simply

reweighing the adaptation evidence, doc. 8 at 4-9, thus ignoring staleness and the substantial evidence factor (*i.e.*, this Court cannot reweigh evidence but in fact must determine only whether there is some substantial evidence that supports the ALJ's ruling).

One point warrants special attention here. Carter expressly argues that the ALJ's failure to mention her IQ scores in his decision constitutes "*per se* error [that] establishes that the ALJ failed to properly consider Listing 12.05C at all." Doc. 8 at 6. That's not the law. So long as the ALJ's path of reasoning is obvious, failure to expressly mention data points, documents, and even legal standards constitutes no reversible error.[9] Too, the ALJ more or less accepted that Carter met the IQ prong, and chose to focus on the second (adaptation) prong. He even said so

---

[9] *See Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986) ("while the ALJ did not explicitly state that the appellant's impairments were not contained in the listings, such a determination was implicit in the ALJ's decision."); *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (ALJ need not discuss all the evidence); *O'Neal v. Comm'r of Soc. Sec.*, 614 F. App'x 456, 459 (11th Cir. 2015) (substantial evidence supported ALJ's implicit rejection of Listing 12.05C); *Gray v. Comm'r of Soc. Sec.*, 454 F. App'x 748, 750 (11th Cir. 2011) (upholding ALJ's implicit finding that claimant's impairments did not meet a listing based on record evidence); *Sharpe v. Astrue*, 2008 WL 1805436 at *6 (N.D. Fla. Apr. 15, 2008) (as long as "the implication [is] obvious to the reviewing court[,] . . . the Eleventh Circuit does not require an explicit finding as to the claimant's credibility") (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)); *Warbington v. Colvin*, 2013 WL 6627015 at *4 (S.D. Ala. Dec. 17, 2013).

during the hearing. Doc. 6-2 at 52 ("The first prong of the [Listing 12.05C] test, which was the I.Q. issue, may have been met"; he then focused on the second prong, as did claimant's counsel); *id.* at 61-62 (again noting that Carter probably met the IQ prong, "but the adaptive functioning issue cuts against that").

Furthermore, while the ALJ must examine IQ test results in conjunction with other medical evidence and the claimant's daily activities and behavior, *Popp*, 779 F.2d at 1499-1500; *Long v. Colvin*, 2014 WL 1338503 at * 3 (N.D. Ala. Mar. 31, 2014), he is not required make an express validity determination of a claimant's IQ score. It is a data point. And where adaptation evidence prevents or rebuts the IQ-presumption, that's enough. *Perkins v. Comm'r of Soc. Sec.*, 2014 WL 223905 at *3 (11th Cir. 2014) (substantial evidence supported ALJ's determination that claimant seeking disability insurance benefits and supplemental security income was not "mentally retarded" to the point where he had an impairment equaling a listed impairment, even though he had an IQ score of 69; claimant had prior gainful employment as a skilled cook, had managed others, a vocational expert concluded that his past work was

skilled, and claimant had good daily activities including driving); *Hickel*,

539 F. App'x at 984–85 (substantial evidence supported the ALJ's finding

that the claimant lacked the required level of deficits in adaptive

functioning to meet Listing 12.05, where five separate medical opinions

attested to the claimant's ability to function at a higher level than her IQ

scores represented).

Still, this is a reasonably close case. The Court may well have

reached a different result; it might have, for example, made different

credibility choices. *See* doc. 6-2 at 23 (finding that Carter's "statements

concerning the intensity, persistence and limiting effects of these

symptoms are not entirely credible, because there is no evidence of any

significant worsening in the claimant's physical or mental condition.").[10]

But that's not the standard. Instead, the ALJ's opinion must be upheld --

even if he fails to use select phraseology -- so long as in substance he has

---

[10]    If the ALJ decides not to credit a claimant's subjective testimony, "he must
articulate explicit and adequate reasons for doing so." *Holt v. Sullivan*, 921 F.2d
1221, 1223 (11th Cir. 1991). These reasons must be supported by substantial
evidence and "take into account and evaluate the record as a whole." *McCruter v.
Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). In the instant case the ALJ explained
this credibility choice by noting, *inter alia*, a 2012 EEG report revealing "no epileptic
form discharges or focal showing," a normal EEG, and an apparent relative effective
treatment with medications. Doc. 6-2 at 23.

applied the proper legal standard (including, particularly with reference to this case, the Listing 12.05C criteria) and his decision is supported by substantial evidence. Here, he applied it to, *inter alia*, partly stale IQ evidence (*see supra* n. 2) that is coupled with a borderline intellectual functioning diagnosis that is "mutually exclusive" of intellectual disability. *Jordan v. Comm'r of Soc. Sec. Admin.*, 470 F. App'x 766, 768-69 (11th Cir. 2012); *see also Hickel*, 539 F. App'x at 984-85 (physicians' assessment that claimant had borderline intellectual functioning rather than mild mental retardation supported finding that claimant did *not* meet Listing 12.05).[11] He also expressly considered "the entire record," doc. 6-2 at 22, which thus included (though he did not expressly mention) supporting opinions from SSA consultants. *See* doc. 6-8 at 43 (report by state agency psychologist David A. Williams, PhD, that she suffered no limitations in activities of daily living or maintain

---

[11] Here, Dr. Hartzell (in his 2007 report) found that Carter "functions in the *borderline* range of intelligence" with a "Full Scale I.Q. of 69," indicating "that she functions in the *extremely low* classification of intelligence overall and at about the *second* percentile of intelligence as compared to other women her age." Doc. 6-8 at 24. However, he also noted her ability to "maintain concentration and attention to tasks," "remember and . . . follow simple instructions," "interact with co-workers, supervisors and/or the public as she is working full-time currently," and "adhere to a work schedule and . . . meet production norms on simple tasks in a job situation, as she is working currently." *Id.* at 26; *see also* doc. 6-2 at 20, 21 (the ALJ's ruling relied on this evidence).

social functioning, could follow simple instructions and had intact adaptive skills); *id.* at 42 ("Evidence does not establish the presence of 'C' criteria"); *id.* at 43 ("No substantial limitations other than [moderate] ability to remember and understand complex information"); *id.* at 83-85 (Robert Koontz, PhD) (April 18, 2011 report -- same); *id.* at 82 (Bettye Stanley, D.O. report) (no medically determinable physical impairment); *id.* at 78 (treatment for bronchitis, doctor urged her to stop smoking).

## IV. CONCLUSION

The ALJ's conclusion that Carter is "not disabled," doc. 6-2 at 30, therefore should be **AFFIRMED** and this case **DISMISSED WITH PREJUDICE**.

**SO REPORTED AND RECOMMENDED**, this  7th  day of July, 2016.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA